

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-23-00056-CV

_____

WCJ ASSETS, LTD., Appellant

V.

US TRINITY BRIDGEPORT, LLC, Appellee

---

On Appeal from the 271st District Court
Wise County, Texas
Trial Court No. CV20-08-579

---

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

# MEMORANDUM OPINION

## I. Introduction

Appellant WCJ Assets, Ltd. perfected this interlocutory appeal from the trial court's modified temporary-injunction order, which granted the relief requested in a temporary-injunction application filed by Appellee US Trinity Bridgeport, LLC (UST). *See* Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (authorizing interlocutory appeal from an order granting a temporary injunction). The temporary-injunction order restrains WCJ from executing with a third-party lessee a lease that permits mining operations on a tract of land that WCJ had conveyed to UST. In the conveyancing documents, WCJ had reserved the right to mine certain minerals from the conveyed property. UST has moved to dismiss the appeal as moot. We grant UST's motion.

Our reasons for granting the motion to dismiss are multi-pronged:

- WCJ has now executed an agreement with a different third party to mine the property, and that event produced a change in the status of the parties that moots the question of whether the restraint in the trial court's temporary-injunction order requires interlocutory review.

- The trial court has rendered an interlocutory summary judgment that moots the question of whether UST made a showing of a probable right of recovery at the temporary-injunction hearing and makes the legal

2

question now resolved by summary judgment an issue properly resolved in an appeal on the merits.

- WCJ predicates its appeal on the questions of whether the trial court erred (1) by granting the injunction without a showing that execution of the lease it is restrained from executing would irreparably harm UST and (2) by failing to properly document that conclusion in its temporary-injunction order. WCJ's argument turns primarily on the contention that no harm would result to UST because the trial court could later determine whether the lease at issue was a bona fide exercise of WCJ's rights. Because we conclude that the trial court has now effectively determined that the proposed lease was not a bona fide exercise of WCJ's rights, the question of whether UST failed to show harm because the trial court could later determine the validity of the lease is now moot.

- We also reject WCJ's argument, which was made in a postsubmission brief, that the temporary-injunction order dissolved automatically because UST nonsuited any "cause of action" that challenged WCJ's ability to execute the lease referenced in that order, but we do agree with its present position that appeal of the order is moot.

3

## II.  Factual and Procedural Background

### A.  The underlying transaction between the parties and the terms of an Addendum that is at the center of the controversy

WCJ conveyed an approximately 1,400-acre tract of rural property to UST. The underlying controversy involves the construction of a Special Warranty Deed and a Special Provisions Addendum (the Addendum) attached to the deed that deals with interests reserved by WCJ in the conveyance.

Initially, the parties executed a Farm and Ranch Contract governing the terms of the conveyance.  That contract contained the following provision: "Reservations: Any reservation for oil, gas, or other minerals, water, timber, or other interests is made in accordance with an attached addendum."  Attached to the contract is the Addendum that is the epicenter of the dispute.

The Addendum's terms carried forward into the conveyance of the property when the Addendum was attached and incorporated into the Special Warranty Deed. That deed specified that it was "subject to . . . the terms relating to the Aggregate (as defined hereafter) that run with the land [as] contained in the Special Provisions Addendum to the Farm and Ranch Contract (the 'Contract')."  Then, the deed's reservations that retained "all of the commercially recoverable sand, gravel, and limestone owned by Grantor" referenced the Addendum as the "Contract."

The Addendum reserved to WCJ as the seller the "commercially recoverable sand, gravel, and limestone[,] which may be located on, in, under[,] or produced from

4

the surface of the [p]roperty to a depth of 50 feet below the surface of the [p]roperty [that] is owned by [WCJ] (collectively the '<u>Aggregate</u>')." The Addendum contained further reservations of

> rights of ingress and egress and of reasonable use of the [p]roperty for mining, exploring, testing, operating, developing[,] or removing the Aggregate subject to the limitations contained [t]herein provided that, in the exercise of such rights of ingress and egress and of reasonable use, [WCJ] shall use commercially reasonable efforts in accordance with customary industry standards for mining of aggregate materials to minimize interference with [UST's] use of the [p]roperty.

Also included in the Addendum was a provision entitled "Aggregate Contracts." That provision contained two time limits that have also been the focus of the litigation. The first time limit provided that WCJ and UST would have ninety days to "attempt to enter into a contract or contracts for the sale of the Aggregate to a third-party purchaser." This ninety-day period is defined as the Mining Contract Period. The Addendum then went on to define the parties' duties should the Mining Contract Period expire without a contract for the sale of the minerals. Specifically, this later provision dealt with an Alternative Mining Contract:

> In the event that [UST] and [WCJ] do not enter into the Mining Contract within the Mining Contract Period, [WCJ] shall have the right to enter into a contract or contracts for the mining, removal, transportation[,] and sale of the Aggregate with one or more third parties on terms and conditions satisfactory to [WCJ] provided such contract has a reclamation plan in accordance with industry standards (whether one or more the "Alternat[iv]e Mining Contract"), subject to [UST's] Right of First Refusal . . . .

If a Mining Contract, an Alternative Mining Contract, or a contract entered into with UST as a result of its exercise of its right of first refusal were not entered into "within three (3) years after the expiration of the Mining Contract Period," another provision of the Addendum would be triggered by which WCJ would become obligated to "convey it[]s rights, titles[,] and interests in the Aggregate by special warranty deed to [UST,] and [WCJ would] no longer have any interest in the Aggregate[,] including without limitation executive and/or royalty rights provided that [WCJ would] retain a ten percent (10%) royalty interest in the Aggregate."

**B.      A summary of the litigation focusing on whether a crushing-and-screening plant could be placed on the property and the temporary injunction at issue in this appeal**

The ninety-day Mining Contract Period specified in the Addendum passed without the creation of a Mining Contract. Eventually, WCJ sued UST. The litigation has centered on WCJ's attempts to exercise its right to enter into an Alternative Mining Contract with a third party for the mining of the Aggregate and more particularly has centered on whether the rights that WCJ retained pursuant to the Addendum allowed the placement of a crushing-and-screening plant on the property to process the minerals mined from it. Indeed, WCJ's original petition sought the following declaration:

> WCJ requests a declaration from the [c]ourt regarding the parties' rights and obligations under the [d]eed and Addendum. Specifically, WCJ requests that the [c]ourt grant declaratory judgment that the provisions of the [d]eed, Addendum, and Texas law allow WCJ to utilize the [p]roperty to develop the aggregate material from the [p]roperty[] and

6

*more specifically the right to operate a crushing*[-]*and*[-]*screening plant on the* [*p*]*roperty.* [Emphasis added.]

UST countered with its own declaratory request. Specifically, UST requested

a declaration from the [c]ourt regarding the parties' rights and obligations under the Farm and Ranch Contract and the Special Provisions Addendum. Specifically, [UST] request[ed] that the [c]ourt grant declaratory judgment that the Farm and Ranch Contract and the Special Provisions Addendum is valid and enforceable and [sought] a declaration of its and WCJ's obligations, rights[,] and duties under the Farm and Ranch Contract and Special Provisions Addendum.[1]

The event that brings the matter under our review is WCJ's tender of a proposed Second Rogers Lease. That tender was intended to trigger UST's right of first refusal as outlined in the provisions of the Addendum. Instead, it triggered another in UST's serial requests for injunctive relief from the trial court predicated on the claim that WCJ's attempted exercise of its rights was not bona fide. On this occasion, the request was UST's "Application for Temporary Restraining Order and Application for Temporary and Permanent Injunction."

The Application spans more than twenty pages, but its introduction focuses on UST's objection to the Second Rogers Lease because that lease permits a crushing-and-screening plant to be located on the property:

---

[1]Although in its counterclaim UST objected to the operation of a crushing-and-screening plant on the property, it also complained of a laundry list of ways in which it contends WCJ's purported Alternative Mining Contracts exceed the Addendum reservation's scope of WCJ's rights. In addition, UST complained that by negotiating the Second Lease Agreement from Rogers Group, Inc. (Second Rogers Lease), WCJ had breached the parties' contract.

> [T]his [temporary restraining order] is necessitated by WCJ's continued and persistent attempts to lease rights to third parties that WCJ simply does not possess and that go beyond WCJ's actual rights that the parties bargained for and agreed to in the purchase agreement and its addendum. *WCJ, under the guise of nonexistent rights, seeks to severely disrupt and destroy [UST's] property through the implementation of a destructive crushing[-]and[-]screening facility[] and mining and manufacturing operations on the real property. Despite failing to point to any listed right in any agreement between the parties, WCJ has communicated with and engaged several mining companies for the construction of the aforementioned operations.* [Emphasis added.]

Because the Second Rogers Lease allegedly granted rights that UST argued that WCJ did not have the right to grant, UST further argued that the contract was again not a bona fide offer that triggered UST's right-of-first-refusal obligations under the Addendum. The reply that UST filed in support of its request for injunctive relief highlighted again its contention that the Second Rogers Lease contained rights outside the scope of the Addendum, including the right to manufacture aggregate and to operate a crushing-and-screening plant on the property.

The trial court conducted a hearing on UST's temporary-injunction application. The lion's share of the testimony presented at the hearing centered on the issue of placing a crushing-and-screening plant on the property. The trial court heard evidence on the following topics:

- the parties' negotiations leading up to the execution of the contract for the property's purchase and the Addendum and whether those negotiations envisioned an on-site processing facility for the mined material;

8

- expert legal testimony and other expert testimony regarding whether the language of the Addendum's reservations included the right to operate a crushing-and-screening plant on the property;

- the use of water in the processing of the mined material and whether WCJ or UST held the water rights on the property;

- the physical characteristics of a crushing-and-screening plant;

- the deleterious effects on the property of a crushing-and-screening plant;

- how long it would take before a crushing-and-screening plant might be constructed on the property if the Second Rogers Lease were executed;

- whether the expert witnesses knew of an aggregate operation where there was not an on-site crushing plant; and

- the detrimental effects to each party should the trial court permit or not permit the execution of the Second Rogers Lease with its corresponding trigger of the right of first refusal specified in the Addendum.

No one challenged that the Second Rogers Lease permitted the placement of a crushing-and-screening plant on the property, and the proposed Second Rogers Lease introduced into evidence at the injunction hearing contained such a provision.[2]

---

[2]Section 1.5(b) of the proposed Second Rogers Lease provides,

**Processing Plant.** Lessee shall, at such time as Lessee may elect in its sole discretion, erect or otherwise place on the [p]roperty at least one processing plant for the purposes of crushing or otherwise processing Aggregate. The

The parties also clashed on the question of whether the type of irreparable harm necessary to support the issuance of a temporary injunction would occur if WCJ were permitted to execute the Second Rogers Lease. UST argued that execution of the Second Rogers Lease would cause immediate harm to the property while WCJ argued that the process of permitting a mining operation on the property would delay any potential harm for years.

The parties also had differing views of what the status quo was that the trial court should protect and whether enjoining execution of the Second Rogers Lease was necessary to protect UST or if that restraint would harm WCJ. In essence, UST argued that if the Second Rogers Lease were executed, it might be forced to respond in the ten days that it had to exercise its right of first refusal before there was a legal ruling on whether the Second Rogers Lease was a bona fide Alternative Mining Contract under the terms of the Addendum. UST's claimed fear was that if it did not predict correctly, its rights could be irreparably harmed.

WCJ countered that because of several factors that had occurred, the three-year period for it to enter into an Alternative Mining Contract would expire a few months after the injunction hearing was scheduled to be held. To enjoin the execution of the Second Rogers Lease and potentially allow the three-year Alternative Mining Contract period to lapse would needlessly put WCJ's rights in peril because the mere execution

---

configuration, structure, specifications[,] and extent of such processing plant(s) shall be at the sole discretion of Lessee.

of the lease would, according to WCJ, cause no harm to UST. As we understand the argument, WCJ contended that the lease could be executed and that the trial court could later make the legal determination regarding whether the executed Second Rogers Lease was a bona fide exercise of its rights under the Addendum. If the trial court later determined that the Second Rogers Lease was not a bona fide exercise of WCJ's rights, WCJ would lose its rights to argue that the Second Rogers Lease was a bona fide Alternative Mining Contract that had triggered UST's duties. We glean our understanding from the following argument made by WCJ's counsel:

> Well, I would argue that we have a right, but we're not exercising that right. There's no threat to do any injury to their land. And, indeed, I want to disagree completely with what counsel just said. They have a clear remedy, and the [c]ourt just said it. *We're going to have a trial some*[]*day, and you're going to argue whether or not this contract has legal enforceability. That's the remedy. And if they win, they win*[,] *and we can't go forward and mine.*
>
> But right now the status quo changes if the [c]ourt takes away from my client the right to sign a contract. There is no damage. We said it again, and I know -- but it makes sense. I could hand the contract to [WCJ's representative] right now, and he could sign it and we'd all sit here and look and say where's the damage. And we could sit here and wait and wait and wait and wait, and there is no damage. That's their burden, [Y]our Honor. [Emphasis added.]

Later, WCJ's counsel again reiterated the argument regarding why enjoining execution of the lease injured WCJ but did not injure UST:

> Very simply, [Y]our Honor, [UST] cannot articulate any irreparable injury, any damage at all. If we're -- if they're right and we're wrong, there's no harm because they've lost nothing.

To the flip side -- and they cannot contradict this -- if this [c]ourt enjoins my client from signing this lease, we lose -- and this April deadline is coming -- we lose this -- it's a real property right -- this reservation of tens or hundreds of millions of dollars of rock. We literally lose that. So that changes the status quo.

The only way the status quo changes is if the [c]ourt signs the injunction. If the [c]ourt does not sign the injunction, we're still here. *And, again, if they're right, if they win at trial, this is a complete nullity.* So there's no damage. We can sign 18 contracts to Sunday, and if they have no legal effect, there's no legal damage. [Emphasis added.]

The trial court eventually signed a modified temporary-injunction order stating that "WCJ is enjoined from executing the Second . . . Rogers Lease."[3] The irreparable injury cited in the modified order was the following:

WCJ's threat to cause direct damage to [UST's] real property and personal property of devaluation and destruction—as the surface estate currently houses over 1,000 wild, domestic, and exotic animals on the property and serves as a retreat for United States Military veterans. Further, [UST] will be irreparably harmed by WCJ's threat to cause direct damages to [UST's] real[-]property rights, as conveyed and maintained in the Farm and Ranch Contract and Special Provisions Addendum, dated[] November 12, 2019. [UST] lacks any adequate remedy at law due to the threat to [UST's] real and personal property as described herein. If WCJ is not enjoined from executing the second proposed mining lease, tendered to [UST] on or about November 18, 2022, between WCJ and Non-Party Rogers Group Inc., then [UST] will . . . experience imminent and irreparable harm.

---

[3]The modified temporary-injunction order differed from the original injunction order because it did not restrain WCJ "from enforcing the provision entitled, 'Buyer's Right of First Refusal' in the Special Provisions Addendum of the Farm and Ranch Contract executed on or about November 12, 2019."

12

**C. The summary-judgment orders entered by the trial court that appear to resolve the controversy between the parties on whether the Second Rogers Lease was a bona fide exercise of the Alternative Mining Contract provision**

After the temporary-injunction hearing, the parties began the process of resolving the controversy through summary judgment. WCJ filed an amended petition that repeated its declaratory-judgment request asking the trial court to decide that the Addendum's reservation included the right to operate a crushing-and-screening plant on the property. WCJ also filed a motion for partial summary judgment seeking relief to avoid the potential adverse consequence that it had told the trial court that it might suffer should it be enjoined from executing the Second Rogers Lease: WCJ asked the trial court to order that the three-year deadline for an agreement to an Alternative Mining Contract be tolled until its appeal of the trial court's injunctive relief was final.

UST filed its own motion for summary judgment on WCJ's claims. The motion—supported by twelve exhibits—raised two grounds, one of which focused on the much disputed crushing-and-screening plant and WCJ's declaratory-judgment request focusing on the right to operate that type of plant on the property:

> WCJ asserts two claims—(1) that it is entitled to a declaration from the [c]ourt that it can install and operate a massively disruptive limestone crushing[-]and[-]screening plant on[-]site at the ranch, and (2) that [UST] breached the subject contract by purportedly failing and refusing to cooperate with WCJ to secure a mining contract within [ninety] days of closing. Each of these claims is without factual and legal basis. [UST] therefore respectfully requests that the [c]ourt grant summary judgment in favor of [UST] as to both claims.

13

WCJ's response—supported by thirteen exhibits—clearly challenged UST's view of what the words in the Addendum mean and whether those words permit the processing of mined rock on the property:

> What is the meaning of "develop and remove the Aggregate"? Those are the operative words of the parties' contract that UST must prove only have one clear meaning as a matter of law that does not include processing mined rock into saleable aggregate. UST has not and cannot meet that burden. While UST attempts to argue what these words do not mean, UST wholly fails [to cite] the legal standard to prove what they do mean. On the other hand, WCJ's evidence proves exactly what these words mean in the context of both the parties' negotiations and the industry custom and norm: to process the mined rock into saleable aggregates. At best for UST, these words are ambiguous, thus necessitating a trial on this issue of fact. At worst for UST, these words mean processing the rock on-site, which is frankly the only reasonable interpretation within the context of the evidence before the [c]ourt. As such, UST's [m]otion must be denied.

UST filed a reply to WCJ's response with an introduction that again crystalized the issue on summary judgment as being the right to place a crushing-and-screening plant on the property:

> [T]he [c]ourt should apply the plain, ordinary, and generally accepted meanings of "developing" and "removing[,"] which does not include the additional language of the right to construct a separate crushing[-]and[-]screening facility on the [p]roperty, and disregard the improper parol evidence, which was introduced for the purpose of creating an ambiguity. Therefore, the [c]ourt should grant [UST's] Motion for Summary Judgment as the Contract is clearly unambiguous as written.

The trial court granted UST's motion with an order that stated the following:

> On January 23, 2023[,] the [c]ourt heard oral arguments of [WCJ] and [UST] regarding the Motion and the relief sought therein[,] and[] having considered [UST's] Traditional Motion for Summary Judgment (the

14

"Motion"), all responses, replies, and the admissible evidence in the summary[-]judgment record, and arguments of counsel, the [c]ourt finds that the Motion should be, in all things, **GRANTED**.

**IT IS HEREBY ORDERED** that [UST's] Traditional Motion for Summary Judgment is **GRANTED**.

The trial court signed this order three days before it signed the modified temporary-injunction order that is at issue in this appeal. The trial court later denied WCJ's motion for partial summary judgment.[4]

---

[4]UST also filed a no-evidence motion for summary judgment that challenged a fraudulent-inducement claim pleaded by WCJ. The trial court granted this motion. In addition, UST filed a "Motion for Determination of Issues of Law" that challenged issues raised in WCJ's fifth amended petition. Specifically, the motion recited the following:

2. First, [WCJ's] new causes of action are barred by the Summary[-] Judgment Order because[] (1) [WCJ] cannot amend its pleadings to undermine the Order; (2) the Order bars subsequent claims that are based on issues already determined by the [c]ourt, and (3) [WCJ] waived its new arguments by failing to raise them in its response to [UST's] Motion for Summary Judgment.

3. Second, [WCJ] impermissibly seeks a declaratory judgment that its ability to secure an Alternative Mining Plan within three (3) years has become impracticable due to the [c]ourt's [t]emporary[-][i]njunction [o]rder. This fails for multiple reasons, including that[] (1) declaratory relief is not available to resolve disputes already before the [c]ourt, and [WCJ's] impossibility request hinges on the interpretation of rights provided in the Contract, an issue the [c]ourt has already resolved at summary judgment; (2) an affirmative defense cannot be used to support a declaratory[-]judgment action; and (3) impracticability would only apply to excuse a party's non-performance of an obligation when it has been sued for not fulfilling that obligation[,] yet [WCJ] only has a right, not an obligation, to secure a compliant Alternative Mining Plan. The declaratory request regarding impracticability should be dismissed.

Shortly after the trial court signed its last summary-judgment order, UST filed a notice of partial nonsuit:

> [UST] hereby dismisses, without prejudice, its breach[-]of[-]contract counterclaim.   This non[]suit is in accordance with [UST's] oral representations in open court at the March 2, 2023 hearing in this case. [UST] does *not* nonsuit its claim to attorneys' fees as a prevailing party in a declaratory[-]judgment action under Texas Civil Practice and Remedies Code § 37.009.

The trial court memorialized the nonsuit in an order dismissing UST's breach-of-contract claim.

## D.     The litigation pivots to a new controversy

Shortly after the trial court rendered the summary-judgment order denying WCJ's motion for partial summary judgment, UST filed a new application for temporary restraining order and temporary and permanent injunction.   This application sought to enjoin the execution of some manner of mining agreement between WCJ and an entity identified as Brazos Valley Contracting Company (BVCC); the application described the agreement as the Second BVCC Lease.   The

---

4. Third, [WCJ's] mutual and unilateral mistake claims should also be dismissed.  For there to be a mutual mistake, the parties must share the same mistaken belief or assumption, which does not exist here. Moreover, the unilateral mistake of a party cannot alone support a claim for relief.

5. Thus, [UST] requests that the [c]ourt find [WCJ's] request for declaratory judgment based on an affirmative defense and [WCJ's] claims under mutual and unilateral mistake are unactionable.   [Footnotes omitted.]

The trial court granted the Motion for Determination of Issues of Law.

16

trial court denied UST's application for injunctive relief to forestall the execution of the Second BVCC Lease.

The new controversy embodied in UST's denied injunction application prompted an inquiry from this court. We issued an order asking whether the Second Rogers Lease that is the subject of the temporary-injunction order on appeal remained viable in light of what is apparently an agreement with another party to conduct mining operations on the property, i.e., whether the existence of the Second BVCC Lease mooted the question regarding the validity of the trial court's temporary-injunction order.

WCJ filed a response that attached an email from Rogers's counsel claiming that it still wished to execute the Second Rogers Lease and represented that "the contractual offer described as the 'Second . . . Rogers Lease' in the trial court's Modified Order Granting [UST's] Application for Temporary and Permanent Injunctive Relief (signed January 27, 2023) remain[ed] an outstanding offer from Rogers to lease the property at issue on the terms set forth in that offer."

WCJ, however, did not dispute that it had entered into an agreement with BVCC—the entity referenced in UST's denied injunction application—but instead sought to minimize the effect of that agreement:

> The Second BVCC Alternative Mining Contract—incorrectly referred to by [UST] as a "lease" (the "Second BVCC Lease")—is not a lease[5] and does not conflict with the Second . . . Rogers Lease. The Second BVCC

[5]We will hereinafter refer to this document as the BVCC agreement.

17

Alternative Mining Contract[] . . . is a contract for only the provision of mining services and does not convey a property right to BVCC. If the modified temporary injunction is vacated, it is WCJ's intent to execute the Second . . . Rogers Lease and then simply not engage BVCC's mining services, as provided in the Second BVCC Alternative Mining Contract: "Work shall commence with[in] [sixty] days after WCJ issues notice to proceed." [Footnote omitted.]

Though carefully phrased, WCJ appears to acknowledge that it has now engaged an entity to mine the property on its behalf.

WCJ's response to our order also argued that the parties have continued to litigate and, thus, that there are live controversies between the parties demonstrating that our mootness concerns are unfounded:

WCJ argued against mootness in its response to [UST's] motion to dismiss and in its surreply in part because [UST's] first amended counterclaim remained unadjudicated. It was not the subject of [UST's] nonsuit, which nonsuited only its breach[-]of[-]contract counterclaim. Since then, [UST] filed a second amended counterclaim (attached as Exhibit 3 and soon to be included in a supplemental clerk's record), and the underlying case is now much farther from being adjudicated than when [UST] filed its motion to dismiss. [Footnote omitted.]

WCJ has now provided us with UST's latest counterclaim in a supplemental clerk's record. But the counterclaim indicates that the controversy between the parties has shifted from the controversy central to the injunction that WCJ appeals. In the counterclaim, UST now seeks to litigate the effect of the BVCC agreement that was the subject of its denied injunction application:

1. This counterclaim arises from WCJ's execution of a vague and overreaching third-party mining lease with Brazos Valley Contracting Company ("BVCC") (the "Second BVCC Mining Proposal") on [UST's] land. The executed Second BVCC Mining Proposal, WCJ's fourth

18

improper lease submitted to [UST], circumvents [UST's] contracted rights and was executed in violation of [UST's] contractual right of first refusal.

2. The Second BVCC Mining Proposal does not qualify as an Alternate Mining Proposal as contemplated by the Contract and Addendum. It is a one-page document missing a significant number of material terms, making it impossible for [UST] to evaluate for purposes of meaningfully exercising its [r]ight of [f]irst [r]efusal. WCJ was obligated under the contract to submit to [UST] a bona[ ]fide written offer that qualifies under the terms of the contract. It has not done so. Thus, [UST] brings this counterclaim against WCJ.

In the most recent counterclaim, UST highlighted the summary-judgment ruling that we have detailed above—the one in which the trial court resolved the prior central controversy between the parties about whether WCJ had the right to grant the ability to construct a crushing-and-screening plant on the property. Its pleading reads as follows:

**[UST] Wins Summary Judgment on WCJ's Rights Under the Contract.**

On January 23, 2023, this [c]ourt [held a hearing] on [UST's] Traditional Motion for Summary Judgment on WCJ's declaratory[-]judgment claim. WCJ sought a declaration that it had the right to construct an on-site crushing[-]and[-]screening facility and that [UST] did not cooperate with WCJ to secure a Mining Contract. [UST], on the other hand, presented evidence that[] (1) the Underlying Contract unambiguously did not contain the right to construct an on-site crushing[-]and[-]screening facility (nor the right to convey that right); and ([2]) the Underlying Contract unambiguously did not contain the rights incidental and necessary to construct an on-site facility. Two days later, on January 25, 2023, this [c]ourt granted [UST's] Traditional Motion for Summary Judgment and dismissed [WCJ's] declaratory[-]judgment claim. [Footnotes omitted.]

Also attached to the latest counterclaim is correspondence from WCJ's counsel that describes the BVCC agreement as an Alternative Mining Contract. UST interpreted the correspondence as signaling that WCJ was going forward with implementation of the BVCC agreement and that the agreement is operative as an Alternative Mining Contract because UST did not exercise its right of first refusal after receiving the BVCC agreement as an Alternative Mining Contract.

## III. Analysis

### A. We set forth the elements necessary to obtain a temporary injunction, what is subject to review in the interlocutory appeal of a temporary injunction, and when mootness impacts our review.

The appeal of an order granting a temporary injunction focuses on whether the trial court abused its discretion by finding that an applicant has established the elements necessary for the court to protect the status quo pending a determination on the merits:

> [A temporary] injunction functions "to preserve the status quo of the litigation's subject matter pending a trial on the merits." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002) (op. on reh'g) (citing *Walling*[ *v. Metcalfe*], 863 S.W.2d [56,] 57[ (Tex. 1993)]). "To obtain a temporary injunction, the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Id.*

*Hernandez v. Combined Ins. Co. of Am.*, No. 02-20-00225-CV, 2021 WL 520456, at *5 (Tex. App.—Fort Worth Feb. 11, 2021, pet. denied) (mem. op.).

The interlocutory appeal of a temporary-injunction order is not a vehicle to preview what an appellate court's ruling will be in an appeal from a judgment on the merits. *Fuentes v. Union de Pasteurizadores de Juarez Sociedad Anonima de Capital Variable*, 527 S.W.3d 492, 498 (Tex. App.—El Paso 2017, no pet.) ("[A] party may not use an appeal of a temporary[-]injunction ruling to get an advance ruling on the merits." (quoting *Babu v. Zeeck*, 478 S.W.3d 852, 855 (Tex. App.—Eastland 2015, no pet.))). Indeed, whatever legal determinations are made to justify the issuance of a temporary-injunction order do not survive to impact our determination of the merits. *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 637 (Tex. App.—Houston [1st Dist.] 2010, pet. denied) ("Furthermore, Texas law is clear that, generally, a trial court's ruling on a temporary injunction (or other interlocutory judgment) does not support the defense of res judicata."). Nor are the consequences before us of a wrongful, but now moot, temporary-injunction order. *Matott v. Matott*, No. 11-22-00362-CV, 2023 WL 2415279, at *1 (Tex. App.—Eastland Mar. 9, 2023, no pet.) (per curiam) (mem. op.) (holding appeal moot even when "a justiciable controversy still exist[ed] with respect to whether the temporary injunction was wrongfully granted and whether Appellants were damaged").

And because a temporary-injunction order is an interlocutory order, events that continue to occur in the case as it progresses may make a temporary-injunction order moot. The Texas Supreme Court has stated why this court cannot decide moot

controversies and how the passage of events may moot the appeal of a temporary-injunction order:

> Appellate courts are prohibited from deciding moot controversies. *See Camarena v. Tex*[.] *Emp*[.] *Comm'n*, 754 S.W.2d 149, 151 (Tex. 1988). This prohibition is rooted in the separation[-]of[-]powers doctrine in the Texas and United States Constitutions that prohibits courts from rendering advisory opinions. *See* Tex. Const. art. II, § 1; *see also Tex*[.] *Ass'n of Bus. v. Air Control Bd.*, 852 S.W.2d 440, 444 (Tex. 1993); *Firemen's Ins. Co.* [*of Newark, N.J.*] . . . *v. Burch*, 442 S.W.2d 331, 333 (Tex. 1968). A case becomes moot if at any stage there ceases to be an actual controversy between the parties. *See Camarena*, 754 S.W.2d at 151. When a temporary injunction becomes inoperative due to a change in status of the parties or the passage of time, the issue of its validity is also moot. *See Parr v. Stockwell*, . . . 322 S.W.2d 615, 616 ([Tex.] 1959); *Tex*[.] *Educ. Agency v. Dall*[.] *Indep. Sch. Dist.*, 797 S.W.2d 367, 369 (Tex. App.—Austin 1990, no writ). An appellate[-]court decision about a temporary injunction's validity under such circumstances would constitute an impermissible advisory opinion. *See generally Burch*, 442 S.W.2d at 333; *Tex*[.] *Educ. Agency*, 797 S.W.2d at 369.

*Nat'l Collegiate Athletic Ass'n v. Jones*, 1 S.W.3d 83, 86 (Tex. 1999); *see also Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC*, 619 S.W.3d 628, 634–35 (Tex. 2021) (stating that a case becomes moot when (1) a justiciable controversy no longer exists between the parties, (2) the parties no longer have a legally cognizable interest in the case's outcome, (3) the court can no longer grant the requested relief or otherwise affect the parties' rights or interests, or (4) any decision would constitute an impermissible advisory opinion).

The entry of judgment on the legal issues at play in a temporary-injunction order may moot the question of the validity of such an injunction. The Beaumont

Court of Appeals summarized the authority on the question of whether a subsequent judgment moots the appeal of a temporary injunction:

> When a trial court renders a final judgment while an appeal of an order granting or denying a temporary injunction is pending, the temporary[-]injunction order becomes moot. *See Richards v. Mena*, 820 S.W.2d 372[, 372] (Tex. 1991); *Isuani v. Manske–Sheffield Radiology Grp., P.A.*, 802 S.W.2d 235, 236 (Tex. 1991) [(order)]. In this case, the temporary injunction and the summary judgment (which includes a permanent injunction) address the same parties, same issues, and same property. Accordingly, because the interlocutory appeal is now moot, we dismiss the appeal of the temporary injunction in cause number 09-16-00393-CV for lack of subject-matter jurisdiction. *See, e.g.*, *BCH Dev., LLC v. Lakeview Heights Addition Prop. Owners' Ass'n,* No. 05-14-00003-CV, 2015 WL 1756100, [at *1] (Tex. App.—Dallas Apr. 17, 2015, no pet.) (mem. op.); *Livingston v. Arrington*, No. 03-11-00266-CV, 2012 WL 1499490, [at *1] (Tex. App.—Austin Apr. 25, 2012, no pet.) (mem. op.).

*Ridgepoint Rentals, LLC v. McGrath*, Nos. 09-16-00393-CV, 09-17-00006-CV, 2017 WL 6062290, at *5 (Tex. App.—Beaumont Dec. 7, 2017, pet. denied) (mem. op.); *see also Panda Power*, 619 S.W.3d at 635 ("For example, a final judgment granting a permanent injunction typically moots a pending interlocutory appeal from a prior order granting a temporary injunction.").

## B.    A change in the status of the parties has mooted this appeal.

The principle that a change in the status of the parties may moot the controversy over the validity of a temporary injunction prompted our inquiry to the parties that we discussed above. We asked whether WCJ's tender of the BVCC agreement mooted the injunction's restraint on execution of the Second Rogers Lease.

Based primarily on the statements contained in UST's latest injunction application and the fact that the application had been denied, we made the following inquiries:

> Specifically, does the existence of the later BVCC [agreement] referenced in the application indicate that Rogers is no longer seeking to lease the property? If Rogers is no longer seeking a lease, does this also moot the injunctive relief granted in the injunctive order being appealed? Further, if the property that Rogers sought to lease has been leased to BVCC, why is the appealed injunctive order not moot?

As noted, WCJ responded that it still wishes to execute the Second Rogers Lease and raised the distinction that the BVCC agreement "is not a lease and does not conflict with the [Second Rogers Lease]." But in its response, WCJ referenced UST's second amended counterclaim and then provided us a supplemental clerk's record containing that pleading. WCJ told us that this pleading demonstrates that "the underlying case is now much farther from being adjudicated than when [UST] filed its motion to dismiss" for mootness.

But the second amended counterclaim shows two things. First, it shows that a controversy still exists between WCJ and UST but that the focus of the controversy has shifted to whether the BVCC agreement qualifies "as an Alternate Mining Proposal as contemplated by the Contract and Addendum." Second, and critically, an email attached to the counterclaim written by WCJ's counsel to UST's counsel indicates that WCJ has taken the position that the BVCC agreement is the exercise of its rights under the Addendum:

> Since UST did not exercise its right of first refusal per the below correspondence sent on March 3, 2023, WCJ has proceeded in executing

24

the attached Alternative Mining Contract with Brazos Valley Contracting Co. ("BVCC"). We will let you know when BVCC will begin mining. In the interim, we assume UST will want a double gate installed for access off Highway 380. Please let us know if UST wants to install it[] or prefers that WCJ does that.

Also attached is an email from WCJ's counsel to UST's counsel stating, "Please see the attached correspondence from [WCJ's counsel] and proposed contract" that includes the BVCC agreement with hand-written notations showing its acceptance by the parties.

Thus, the controversy in this case has now shifted because WCJ has taken the position that the Alternative Mining Contract executed within the three-year period that would allow it to avoid conveying the Aggregate to UST, which it claims it is entitled to execute pursuant to the Addendum, is no longer the Second Rogers Lease but is now the BVCC agreement and that WCJ is going forward with implementation of that agreement. We have no doubt that WCJ will argue on appeal of an eventual final judgment that the Second Rogers Lease was a valid Alternative Mining Contract—no matter its provision permitting the placement of a crushing-and-screening plant on the property. But for now, WCJ has self-altered the status quo that it argued existed at the time of the temporary-injunction hearing by taking the position that the BVCC agreement, and not the Second Rogers Lease, is now the Alternative Mining Contract that exercised its rights under the Addendum and triggered UST's obligation of first refusal. As noted, "[w]hen a temporary injunction becomes inoperative due to a change in status of the parties[,] . . . the issue of its

25

validity is also moot." *Jones*, 1 S.W.3d at 86. WCJ wants to hedge—and admittedly our questions may have prompted the hedge—that the BVCC agreement is somehow a contingency, but the words of WCJ's counsel do not support this conclusion; those words state that the BVCC agreement is now the Alternative Mining Contract executed within the three-year period required to avoid the sale-to-UST provision.

WCJ has changed horses; that change in status does not mean that we might not have to address eventually whether the Second Rogers Lease was a bona fide Alternative Mining Contract, but it does impact when that review should occur. For the time being at least, WCJ has positioned itself to rely on the BVCC agreement as an exercise of its rights under the Addendum and rendered a dead letter the question of whether it should be able to execute the Second Rogers Lease as an exercise of that right.

### C. Because of the trial court's rulings on the merits of the parties' claims, the appeal of the temporary-injunction order is moot.

We also conclude that WCJ's appeal is mooted for an additional reason. Why WCJ pivoted away from the Second Rogers Lease is apparent and provides our second rationale for determining that the controversy over the trial court's temporary-injunction order is moot. We have detailed the parties' arguments at the temporary-injunction hearing and those involved in UST's motion for summary judgment. Both revolve around the question regarding whether the rights reserved to WCJ in the Addendum included the right to build a crushing-and-screening plant on the property.

Because of the obvious effect on the question of mootness of a judgment that resolves UST's right to relief on the merits from WCJ's claim, the parties argue strenuously on both sides of the question regarding whether the trial court's summary judgment may be decoupled from the issues at play in the injunction. WCJ argues that the issues are not coupled, while UST argues that they are. We conclude that the issues cannot be decoupled and that the trial court's summary-judgment ruling resolves the legal question at issue in the injunction; renders our review of that question in the appeal of the temporary injunction moot; and instead, postures the question for review as an appeal from an eventual final judgment.

Several issues are beyond dispute: (1) the Second Rogers Lease allows Rogers to construct a crushing-and-screening plant on the property; (2) the focus of UST's claimed right to relief at the temporary-injunction hearing was whether WCJ retained the right to build such a plant on the property and thus had the right to grant the ability to build such a plant to its lessee; and (3) UST's summary judgment sought a resolution of WCJ's declaratory-judgment claim that a crushing-and-screening plant could be constructed on the property—a claim that we view the trial court as having effectively resolved adversely to WCJ's position. As we will explain below, we cannot construe the trial court's summary-judgment order as anything other than a rejection of WCJ's contention that it has the right to build or can grant the right to build a crushing-and-screening plant on the property. Thus, we conclude that the trial court has resolved—on the merits—the legal issue that formed the basis of its conclusions

27

that UST had shown a probable right to recover on its legal claim that the Second Rogers Lease granted a right that WCJ did not have the right to grant. To address the merits in this appeal would put us in the position of offering an advisory opinion on a question that should be addressed on the merits of an appeal from a final judgment.

We acknowledge that the trial court has not entered a final judgment and that the basis for the rule that a final judgment moots an interlocutory temporary injunction is the fact that the interlocutory order is merged into the final judgment. *See Bonsmara Nat. Beef Co. v. Hart of Tex. Cattle Feeders, LLC*, 603 S.W.3d 385, 390 (Tex. 2020) ("When a trial court renders a final judgment, the court's interlocutory orders merge into the judgment and may be challenged by appealing that judgment."). That merger has not occurred in this case, nor do the parties argue otherwise. But in the form of its interlocutory order granting UST's summary judgment, the trial court has made a ruling on the merits that directly impacts the validity of the Second Rogers Lease. We have no jurisdiction to review an interlocutory summary-judgment order, and as noted, the appeal of a temporary injunction is not a vehicle to obtain a preview ruling on the merits. *See Equip. Performance Mgmt., Inc. v. Baker Hughes, Inc.*, No. 14-15-01000-CV, 2017 WL 1540805, at *2 (Tex. App.—Houston [14th Dist.] Apr. 27, 2017, no pet.) (mem. op.) ("No statute authorizes an interlocutory appeal in this case, so this court has jurisdiction over this appeal only if the trial court's summary-judgment order is final."); *see also Fuentes*, 527 S.W.3d at 498 (holding that appeal of a temporary injunction is not a vehicle to obtain an advance ruling on the merits).

28

To try reviewing the present status of this matter in an interlocutory appeal from a temporary injunction would put us in a position in which every corner we turned, we would meet ourselves coming the other direction with questions that are poised for a review on the merits. If a question integral to the temporary-injunction order is whether the Second Rogers Lease is a valid Alternative Mining Contract, how can we ignore and not address the question resolved by the trial court's summary-judgment ruling that answers that question? And as discussed below, WCJ's argument to invalidate the temporary injunction is that there can be no irreparable harm from executing a lease that can later be invalidated by a ruling on the merits. Again, as we discuss below, how does that question survive when we have concluded that the trial court has rendered a ruling on the merits that invalidates the lease?

WCJ disagrees with our view of mootness because the trial court has not entered a permanent injunction prohibiting the execution of the Second Rogers Lease and disputes that the summary-judgment ruling does not explicitly invalidate the Second Rogers Lease. True enough, but again as we discuss below, that argument turns a blind eye to the fact that the interlocutory summary-judgment order can be construed as resolving the only issue that was the focus of the temporary-injunction hearing: whether WCJ could grant a right that it purportedly did not retain, i.e., the right to place a crushing-and-screening plant on the property.

WCJ specifically argues why we should ignore this state of affairs and go forward with interlocutory review:

29

The temporary injunction is in place and prevents WCJ from signing the Second . . . Rogers Lease, to WCJ's detriment. The temporary injunction is therefore literally not moot, and this [c]ourt can affect WCJ's rights by finding the modified temporary injunction to be void and by vacating it. Upon the [c]ourt's vacating the temporary injunction, WCJ can sign the lease,[6] and then the parties can address the partial summary[-]judgment order in a regular appeal once a final judgment is rendered. [Footnotes and record reference omitted.]

WCJ then fleshes out this argument in an accompanying footnote:

UST is correct that vacating the temporary injunction "will not have any effect" on the yet-to-be-appealed partial summary[-]judgment order, and that is part of WCJ's point that the partial summary[-]judgment order also has no effect on the temporary injunction, as explained in WCJ's response. But UST is incorrect that, as "part of obtaining injunctive relief, [UST] proved that there was no right to a crushing[-]and[-]screening plant." All UST ostensibly demonstrated was a likelihood of success. [Reply references omitted.]

Again, we disagree with the premise that the question of the validity of the Second Rogers Lease remains only a likelihood in view of what has transpired in the trial court. We disagree that the very basis of WCJ's interlocutory appeal remains—that it should be able to preserve its rights by executing the Second Rogers Lease[7]—when it is no longer an unresolved question in the trial court that the lease contains a

---

[6]As explained in more detail below, any attempt by WCJ to proceed with signing the Second Rogers Lease, which permits the construction of a crushing-and-screening plant, would be contrary to the trial court's summary-judgment ruling, which indicates that WCJ does not have the right to construct a crushing-and-screening plant on the property.

[7]The three-year post-mining contract period has passed without the Second Rogers Lease's being signed, and thus it can no longer serve the purpose of an Alternative Mining Contract to prevent the sale-to-UST provision from becoming operative.

provision showing that it is not a bona fide Alternative Mining Contract. And again, WCJ has moved the controversy beyond the issues at play in the temporary-injunction hearing by now taking the position that the BVCC agreement is an exercise of its right to enter into an Alternative Mining Contract. Events have moved too far beyond the controversies at play in the temporary injunction, making the temporary-injunction issues moot.

> **D.**    **The trial court's rulings on the merits moot WCJ's arguments regarding why the restraint of the temporary-injunction order harms it.**

WCJ also argues that its temporary-injunction appeal is not moot because even if the trial court has resolved the question of UST's probable right to recovery, the question remains outstanding regarding whether there is irreparable harm to support the issuance of the injunction. This argument is encapsulated in a footnote in WCJ's response to UST's motion to dismiss: "At best, UST can only establish that the partial summary[-]judgment ruling[8] would prove its probable right to relief sought on its counterclaims, but that does not moot the third injunctive-relief element of 'probable[,] imminent, and irreparable injury' to warrant a finding of mootness of this appeal." We disagree with the premise that if the question of UST's probable right to recovery is mooted, the question of whether harm exists to support the injunction survives for our interlocutory review.

---

[8]Although WCJ refers to this as a partial summary-judgment ruling, the trial court's various orders have resolved all of WCJ's claims.

31

Not only did the trial court's summary judgment appear to moot this controversy because the Second Rogers Lease allows the placement of a crushing-and-screening plant on the property despite the trial court's declining to rule that such a right was not reserved to WCJ in the contract, but that judgment also renders moot the underlying basis of WCJ's primary argument regarding why the injunction is invalid. The premise of WCJ's argument at the temporary-injunction hearing and on appeal is that the trial court erred by restraining WCJ from executing the Second Rogers Lease because UST would suffer no harm from that act. WCJ's brief challenges the argument that UST made at the temporary-injunction hearing that execution of the lease would irreparably harm its right to validly exercise its right of first refusal.[9] And as we noted above, WCJ's counsel argued at the hearing that mere

---

[9]The core of this argument in WCJ's brief follows:

Moreover, UST has claimed that this issue has been legally and factually determined in the trial court's partial summary[-]judgment ruling on WCJ's claim for declaratory relief. WCJ disputes the breadth of the partial summary[-]judgment ruling, but by taking this position, UST has confirmed that it is no longer facing a dilemma—and therefore no longer facing harm—on whether to exercise its right of first refusal. For UST explained as follows in its response to WCJ's motion for reconsideration of the temporary injunction:

Here, WCJ is attempting to change the status of the [p]roperty by entering into a [l]easehold with Rogers. Executing that lease with Rogers then triggers [UST's] right of first refusal, putting [UST] to an election of whether to exercise the right of first refusal *or to gamble that it will prevail at trial.* If [UST] exercises the right of first refusal, it will do so at an inflated price beyond market for what [UST]

32

execution of the Second Rogers Lease, in and of itself, would do UST no harm because the trial court could later determine whether that lease was a valid Alternative Mining Contract, and no immediate physical harm to the property would occur because operations would not occur until the permitting process was complete. In essence, WCJ argues that UST would suffer no harm because if the trial court allowed execution of the Second Rogers Lease, that court could later determine whether that lease triggered UST's obligation to exercise its right of first refusal and could make

believes WCJ actually owns and has the legal ability to convey. *But if* [*UST*] *waits for trial and loses*, it will have forever lost its valuable right of first refusal. *That election and the timing of it* that WCJ has repeatedly and continually attempted to force onto the [c]ourt and [UST] *is the irreparable, imminent harm that must be enjoined.* . . . [T]he imminent, irreparable harm . . . relates to the right of first refusal and the impossible choice to which WCJ is attempting to force on [UST]. [Emphases added.]

This is a tacit admission by UST that, because it prevailed on the merits in the partial summary[-]judgment ruling, it is no longer facing harm. Based on the above evidence and UST's admission that it no longer faces "imminent, irreparable harm . . . relat[ing] to the right of first refusal," there is no evidence of injury to UST's right of first refusal from WCJ's signing the Second Rogers Lease.

Nevertheless, the question of why UST sought to enjoin signing the lease cries out because the obvious and proper course of action would have been to seek to enjoin any mining preparation and mining activity on the property after the lease was signed. [Footnote and record reference omitted.]

33

that determination before the only possible basis that UST has to claim harm—physical damage to the property—occurs.[10]

Assuming the validity of this argument, how does it present a live controversy that still exists when the trial court (in the later summary judgment on the merits outside the temporary-injunction context) declined WCJ's invitation to make a declaration that a central feature of the Second Rogers Lease—the right to place a crushing-and-screening plant on the property—was permitted? Irreparable harm became irrelevant because the trial court was not relying on harm to leave the status quo in place until it had time to make its final decision. Instead, it made the decision that, as a matter of law, WCJ is not entitled to a declaration that the act of placing a crushing-and-screening plant on the property is permitted. The need for the trial court to give itself the breathing room to make that decision by concluding that irreparable harm could occur in the period to make that decision is now a past concern.

---

[10]With the question of harm moot, the question of whether the modified temporary-injunction order adequately documented a finding of irreparable harm as required by Texas Rule of Civil Procedure 683 also appears moot. *See Clark v. Hastings Equity Partners*, 651 S.W.3d 359, 373 (Tex. App.—Houston [1st Dist.] 2022, no pet.). ("To comply with Rule 683, a trial court must set out in the temporary[-]injunction order the reasons the court finds it proper to issue the injunction, including the reasons the applicant will suffer irreparable harm if the injunction does not issue. Tex. R. Civ. P. 683.").

**E.** **We conclude that the trial court's summary judgment order invalidated WCJ's claim that a crushing-and-screening plant could be placed on the property as envisioned by the Second Rogers Lease.**

To wrap up, we address WCJ's argument that we cannot glean a ruling on the merits from the trial court's grant of UST's summary-judgment motion because of its form:

> The partial summary[-]judgment order on WCJ's claim for declaratory relief does not declare anything or make any rulings other than a generic grant of UST's motion for partial summary judgment. Contrary to UST's assertions, it does not state that "there is no right to have a crushing[-]and[-]screening plant on the property." The partial summary[-]judgment order also does not state that "WCJ did not have the right to build or the right to convey the right to build a crushing[-]and[-]screening plant." And the partial summary[-]judgment order does not state that "there are no rights in the conveyance documents to a crushing[-]and[-]screening plant."

As we understand the argument, it is that no conclusion as to what declaration the trial court was making can be drawn from the summary-judgment order because it does not explicitly state a declaration of the parties' rights. We disagree.

WCJ's premise—that we can glean nothing from the trial court's order because it merely grants UST's summary-judgment motion—is not supported by case law. For example, a prior case from this court dealt with a take-nothing judgment in a suit in which a party sought declaratory relief. *See Downe v. Askey*, 529 S.W.2d 121, 124 (Tex. App.—Fort Worth 1975, no writ). We concluded that we could glean the nature of the declaration by pursuing the following inquiry:

35

> The law appears to be that since no technical form is prescribed for the declaration of rights in a declaratory[-]judgment action, the form of a judgment rendered in such an action is sufficient if the rights of the parties that are sought in the suit to be ascertained can be ascertained from the judgment rendered when considered in view of the controversy involved along with the findings of fact and conclusions of law filed in the case by the trial court.

*Id.* Later cases have cited our opinion for the proposition that the nature of a declaration may be gleaned by examining what was in controversy:

> Moreover, under the liberal construction [that] must be given the [D]eclaratory [J]udgment[s] [A]ct, *Hext v. Price*, 847 S.W.2d 408, 416 (Tex. App.—Amarillo 1993, no writ), no particular form is necessary for the declaration of rights in a declaratory[-]judgment action if, when construed together with the pleadings and any findings, the rights of the parties can be determined from the face of the judgment. *Travis Heights Imp*[*rovement*] *Ass'n v. Small*, 662 S.W.2d [406,] 412–13[ (Tex. App.—Austin 1983, no writ)]; *Downe . . .* , 529 S.W.2d [at] 124 . . . .

*46933, Inc. v. Z & B Enters., Inc.*, 899 S.W.2d 800, 808 (Tex. App.—Amarillo 1995, writ denied); *see also In re An Unborn Child*, 153 S.W.3d 559, 561 (Tex. App.—Amarillo 2004, pet. denied) (stating that "[e]ven though the order does not make a declaration, determination of law, or expressly grant any relief, because no particular form is prescribed for a declaration of rights in a declaratory[-]judgment action[] and [because] matters of statutory construction are questions of law for the court," the court would "construe the word 'finds' to constitute a declaration based upon facts found from the evidence" (citations omitted)).

More recent cases are less supportive of the proposition that the trial court can forgo stating its declaration in a judgment but still leave the burden on the appellate court to define the parameters of the declaration:

> As drafted, the trial court's judgment does not set forth a declaration of the interest and rights conveyed by the assignments. From the four corners of the judgment, we are left to speculate as to exactly what the trial court determined the rights of the parties under the assignments to be. A properly drafted declaratory judgment should terminate the uncertainty or controversy giving rise to suit by declaring the rights of the parties as to those matters upon which the parties joined issue. *Calvert v.* [*Emps.*] *Ret. Sys. of Tex.*, 648 S.W.2d 418, 419–20 (Tex. App.—Austin 1983, writ ref'd n.r.e.). *See generally* Robert W. Calvert, Declaratory Judgments in Texas—Mandatory or Discretionary?, 14 St. Mary's L.J. 1 (1982). Notwithstanding the fact that the parties may have drafted the judgment and submitted it to the trial court "approved as to form," the failure of the judgment to specifically declare those rights was error.

> In a situation where all parties have moved for summary judgment and one motion is granted and the others are denied, the appellate court should review all parties['] summary[-]judgment evidence and determine all questions presented. *See Bradley v. State ex rel. White*, 990 S.W.2d 245, 247 (Tex. 1999)[; *s*]*ee also* Tex. R. App. P. 43.2(c). The reviewing court should then render the judgment that the trial court should have rendered. *Bradley*, 990 S.W.2d at 247. The questions presented in this case are, what interest is conveyed by the assignments, and what are the rights of the parties? Therefore, this [c]ourt will construe the assignments in question and declare the interests conveyed and [the] rights of the parties as to those matters upon which the parties have joined issue.

*Petro Pro, Ltd. v. Upland Res., Inc.*, 279 S.W.3d 743, 747–48 (Tex. App.—Amarillo 2007, pets. denied) (footnote omitted). Though *Petro Pro* dealt with cross-motions for summary judgment, we read it as indicating an appellate court can glean the nature of

the declaration rendered by the trial court from the issues in controversy in the summary-judgment proceeding.

Again, we express no opinion on any question resolved in the trial court's summary-judgment order; that task awaits an appeal on the merits. The matter-of-law ruling—that WCJ does not get an affirmative declaration—effectively operates as a legal ruling that the Addendum's reservations do not encompass the right to operate a crushing-and-screening plant, even if there is not currently an actual declaration in place that expressly says that. Almost the entirety of the controversy involved in UST's motion for summary judgment was an attack on WCJ's claim that the reservations in the Addendum and Special Warranty Deed permitted the construction of a crushing-and-screening plant on the property. We can efficiently glean what the trial court intended to not declare in its interlocutory order granting UST's motion for summary judgment.

### F. After submission of this matter, WCJ filed a supplemental brief arguing this appeal is indeed moot.

Three weeks after this matter was submitted on the briefs, WCJ filed a supplemental brief that again shifts its position and raises an argument not made in the voluminous prior briefing in this case—indeed, WCJ now argues that this appeal is moot. *See generally* Tex. R. App. P. 39.8 (providing for notice to parties of submission of case). The last two paragraphs of the supplemental brief capture WCJ's new argument asserting that UST has nonsuited the "cause of action" attacking the

Second Rogers Lease underlying its request for injunctive relief and that this act "dissolved" the injunction:

> During this appeal, [UST] nonsuited its first amended counterclaim for breach of contract, leaving only its first amended counterclaim for declaratory judgment pending. When [UST] then filed its second amended counterclaim during this appeal, it omitted its causes of action pertaining to the Second Rogers Lease, and it does not seek any injunctive relief. The causes of action in the first amended counterclaim pertaining to the Second Rogers Lease have therefore been nonsuited. The causes of action in the second amended counterclaim pertain only to the BVCC lease; they do not make any allegations pertaining to the Second Rogers Lease and therefore cannot support the temporary injunction.
>
> Because [UST's] causes of action pertaining to the Second Rogers Lease have been nonsuited, the temporary injunction is not supported by a cause of action and must be vacated. Alternatively, because of the actual and deemed nonsuits of the causes of action in the first amended counterclaim pertaining to the Second Rogers Lease, the temporary injunction dissolved automatically, and this appeal should be dismissed as moot. If the [c]ourt dismisses this appeal as moot because the temporary injunction dissolved automatically, the [c]ourt should affirmatively hold that the temporary injunction dissolved automatically so that the parties and the trial court know the status of the temporary injunction. [Record references omitted.]

UST filed its own supplemental brief in response to WCJ's latest argument. UST argues that WCJ misses the point that UST has never abandoned the declaratory-judgment claim that is the foundation of its suit. In UST's view, its second amended counterclaim alleges verbatim the declaratory-judgment claim made in its first amended counterclaim but then pleads additional facts addressing the ever-evolving landscape created by WCJ's execution of the BVCC agreement. Specifically, UST argues that WCJ's characterization of its pleadings is myopic by failing to

39

recognize that UST is seeking a broad declaration about what characteristics an Alternative Mining Contract may possess. To quote UST's response,

> To get around [UST's] actual pleadings, WCJ mischaracterizes [UST's] claims as "causes of action *pertaining to the Second Rogers Lease*[.]" This is result-oriented wordsmithing. **[UST's] declaratory[-]judgment action is not and has never been lease-specific.** WCJ's declaratory[-]judgment action language requests a general declaration of the parties['] rights under the Farm and Ranch Contract. Specifically, [UST] and WCJ have argued over whether WCJ had the right to build a crushing[-]and[-]screening plant. The trial court ruled via temporary injunction and summary judgment that WCJ did not. This construction of the Farm and Ranch Contract applies to all leases. It would be absurd to relitigate the Farm and Ranch Contract interpretation for each new WCJ lease, yet that's what WCJ attempts to impose through its argument. [UST's] Second Amended Counterclaim still contains the same declaratory[-]judgment action that has underlied [sic] this entire litigation, with the identical pleading allegation, and WCJ is not relieved of its injunctive obligations just because [UST] amended its claims to add *additional* factual allegations and claims relating to WCJ's new and unadjudicated conduct. WCJ's latest attack on the injunction order is without merit. [Record references and references to the supplemental brief omitted.]

Though it approaches the argument with more certainty than is reflected in the record, UST anticipates our holding above: that the trial court's summary-judgment order addressing WCJ's declaratory-judgment claim "effectively operates as a legal ruling that the Addendum's reservations do not encompass the right to operate a crushing-and-screening plant"; that this ruling undermines WCJ's ability to enter into the Second Rogers Lease; and that review of that ruling should be from an appeal on the merits:

> Moreover, as explained in prior briefing, even if the injunction were lifted, WCJ still cannot legally enter into the Second Rogers Lease that

40

contains provisions relating to a crushing[-]and[-]screening plant because the trial court has also decided, independent of the injunction order, that WCJ did not have the right to operate a crushing[-]and[-]screening plant or to convey to Rogers any such right—meaning WCJ must await a final judgment and then *successfully* appeal the trial court's January 24, 2023 summary-judgment order to conceivably gain any relief in relation to the Second Rogers Lease. An order reversing or dissolving the temporary[-]injunction order will not change the summary-judgment order, and the Second Rogers Lease will remain illegal and inoperative. [Record reference omitted.]

We conclude that WCJ's latest premise—that UST's pleadings abandoned a legal basis for a claim that challenges WCJ's claimed right to execute the Second Rogers Lease—is not supported by the record. Nor does the argument alter our view that the trial court has effectively made a merit-based ruling that we interpret invalidates the Second Rogers Lease and that review of that ruling should await an appeal on the merits. This opinion reflects (1) the struggle that we have faced in reconciling the ever-evolving state of the trial-court record as the parties continue to maneuver; (2) the summary-judgment orders rendered that leave it to us to interpret the scope of the rulings being made and to determine when such rulings should be reviewed; and (3) how the arguments on appeal have continually shifted even after the case was submitted. Though we do not accept the premise of WCJ's latest argument, we do note that the relief sought by its new argument now parallels our holding that this appeal of the trial court's temporary-injunction order is moot.

41

## IV. Conclusion

Having determined that the issues at play in the trial court's modified temporary-injunction order are now moot, we set aside the January 27, 2023 "Modified Order Granting [UST's] Application for Temporary . . . Injunctive Relief," and we dismiss WCJ's interlocutory appeal.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered:  June 22, 2023